IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DOUGLAS WAYNE WHITE, | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| v. | § | Civil Action No. 3:11-CV-1304-P-BH |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| **Defendant.** | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to *Special Order No. 3-251*, this case was automatically referred for proposed findings of fact and recommendation for disposition.  Before the Court are *Plaintiff's Motion for Summary Judgment*, filed December 5, 2011 (doc. 17), and *Defendant's Motion for Summary Judgment*, filed December 30, 2011 (doc. 18).  Based on the relevant filings, evidence, and applicable law, the plaintiff's motion should be **DENIED**, the defendant's motion should be **GRANTED** and the final decision of the Commissioner should be **AFFIRMED**.

## I. BACKGROUND[1]

### A.    *Procedural History*

Douglas Wayne White (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claims for disability benefits and supplemental security income benefits under Title II and XVI of the Social Security Act. (R. at 1-3.) He applied for disability insurance and supplemental security income benefits in October 2008, alleging disability beginning October 20, 2008, due to prostate cancer, high blood pressure and

---

[1] The background comes from the transcript of the administrative proceedings, which is designated as "R."

pain.[2]  (*Id*. at 109-122, 138-145.)  His claims were denied initially and upon reconsideration.  (*Id*. at 62-67, 72-75.)  Plaintiff timely requested a hearing before an Administrative Law Judge (ALJ), and personally appeared and testified at a hearing held on October 14, 2009.  (*Id*. at 78-79, 29-48.)  On  April 30, 2010, the ALJ issued a decision finding Plaintiff not disabled.  (*Id*. at 7-22.)  Plaintiff appealed, and the Appeals Council denied his request for review, making the ALJ's decision the final decision of the Commissioner.  (*Id*. at 1-5.)  Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g).  (*See* Doc. 1.)

**B.**     ***Factual History***

     **1.**     **Age, Education, and Work Experience**

Plaintiff was born in 1956.  (R. at 135.)  He has a GED and past relevant work experience as a lead man and a ground man for a railroad company; he also has experience with a drilling company and the construction industry.  (*Id*. at 30-33.)

     **2.**     **Medical Evidence**

On May 28, 2008, Plaintiff visited the emergency room and was admitted to Doctors Hospital in Dallas, Texas.  (*Id*. at 271-272.)  He presented with complaints of lightheadedness and left shoulder and chest pain.  (*Id*. at 282-283.)  Upon examination, his blood pressure was 151/98.  (*Id*. at 282.)  He reported not having taken his blood pressure medication for several weeks.  (*Id*. at 275.)  On May 29, 2008, he had a dobutamine stress echocardiogram but did not complete the test because his blood pressure rose to 232/138.  (*Id*. at 289.)   The test revealed no evidence of myocardial ischemia.  (*Id*. at 288.)  His physician recommended adjustment of his blood pressure medications to maximize control of his condition.  (*Id*. at 283.)

---

[2]  At the hearing before the ALJ, Plaintiff amended his onset date to September 15, 2008.  (R. at 31.)

On June 3, 2008, Plaintiff saw Dr. Paul S. Worrell and reported having been in the hospital with blood pressure of 230/180, shoulder pain and headache. (*Id*. at 196.) His blood pressure was 134/80 on the left side and 144/84 on the right side. (*Id*.)

On June 30, 2008, Plaintiff saw Dr. Worrell again and complained of lightheadedness on a daily basis. (*Id*. at 195.) His blood pressure was 150/96. (*Id*.) The Plaintiff underwent blood work, including a PSA test. (*Id*.)

On July 8, 2008, Plaintiff visited Dr. Worrell to follow up on blood work from his previous visit. (*Id*. at 194.) His lab results showed an abnormal PSA level. (*Id*.) Plaintiff also reported having 6 loose stools daily. (*Id*.)

On August 18, 2008, Plaintiff saw Dr. Worrell. (*Id*. at 193.) He complained of pain due to a "knot" in his mid to upper back and reported that his urine was dark orange. (*Id*.) His blood pressure was 160/98. (*Id*.) The records noted an elevated PSA level of 10.7 from previous testing. (*Id*.) Dr. Worrell recommended vascular and arterial studies, a carotid doppler test and a fasting blood work up, including PSA. (*Id*.) The second blood work up revealed an elevated PSA level of 11.6. (*Id*. at 199.)

On September 10, 2008, Plaintiff saw Dr. Worrell again. (*Id*. at 192.) He complained of hemorrhoid pain, rectal pain and bleeding. (*Id*.) His blood pressure was 144/96. (*Id*.) Dr. Worrell gave Plaintiff a prescription for Lortab. (*Id*.)

On October 13, 2008, Plaintiff saw Dr. E. Paul Kaplan at Urology Associates of North Texas for a prostate ultrasound and a biopsy. (*Id*. at 203-204.) His blood pressure was 160/100. (*Id*.) The pathology report showed a diagnosis of adenocarcinoma, with tumor involving both sides of the prostate. (*Id*. at 200-201.) The Gleason score was 3+4. (*Id*.)

On October 24, 2008, Plaintiff underwent a NM Bone Scan Whole Body at Medical City of Dallas Imaging that showed no radionuclide evidence of bony metastatic disease.  (*Id*. at 206.)

On November 3, 2008, Plaintiff saw Dr. Kaplan for a follow up visit to discuss treatment options for his cancer, including surgery.  (*Id*. at 207.)  He complained of abdominal pain and right leg weakness.  (*Id*.)  Dr. Kaplan referred him to Dr. Worrell for follow up on those complaints and to Dr. Richard Bevan-Thomas for a surgery consultation.  (*Id*.)

On November 17, 2008, Plaintiff saw Dr. Richard Bevan-Thomas.  (*Id*. at 209-211.)  Dr. Bevan-Thomas discussed various treatment options for his cancer, including surgery, radiation and cryoablation.  (*Id*. at 211.)  Plaintiff complained of abdominal pain and bloody stools and experienced pain upon abdominal palpation.  (*Id*. at 209-10.)  Dr. Bevan-Thomas recommended a CAT scan and recommended that Plaintiff see a pain specialist if his discomfort persisted.  (*Id*. at 211.)  The CT report noted a gallstone and aortic vascular calcification but no evidence of aneurysm. (*Id*. at 435.)

On December 17, 2008, Plaintiff saw Dr. Kaplan again for a routine follow up.  (*Id*. at 214-15.)  He again expressed his preference for surgery to treat his prostate cancer.  (*Id*.)

On December 19, 2008, Plaintiff saw Dr. Hanna J. Abu-Nassar.  (*Id*. at 251-259.)  He noted that Plaintiff was scheduled for prostate surgery in January 2009.  (*Id*. at 252.)  He also noted that Plaintiff had a history of hypertension since 2003 but that he felt better when he took his medication. (*Id*.)  Plaintiff reported a dizzy spell in February 2007 with no loss of consciousness, and that he was told at the time that it was secondary to uncontrolled hypertension.  (*Id*. at 253.)  At that time, he underwent a stress test, and the results were negative.  (*Id*.)  He experienced another episode in March 2008, that was again noted as secondary to elevated blood pressure.  (*Id*.)  He underwent no

carotid studies or CT scans but was told that he may have suffered a minor stroke. (*Id.*) Plaintiff had no more episodes. (*Id.*) His blood pressure was 161/94 and there was mild tenderness in the suprapubic region. (*Id.* at 253-254.)

On January 2, 2009, Plaintiff saw Dr. Laurence Ligon for a physical residual functional capacity evaluation. (*Id.* at 260-267.) Dr. Ligon noted that Plaintiff was a 52 year old male alleging disability due to prostate cancer, high blood pressure and pain. (*Id.* at 261.) Dr. Ligon found that Plaintiff's exertional limitations limited him to a light work capacity in that he can occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of about 6 hours in an 8 hour workday, sit for about 6 hours in an 8 hour workday and has an unlimited capacity to push and/or pull. (*Id.* at 261.) His postural limitations included never climbing ladders, ropes and scaffolds, occasionally climbing ramps/stairs and balancing and frequently stooping, kneeling, crouching and crawling. (*Id.* at 262.) Dr. Ligon concluded that Plaintiff's allegations were supported in part by the medical evidence. (*Id.* at 267.)

On January 3, 2009, Plaintiff saw Dr. Worrell. (*Id.* at 317.) He complained that he had pain in his right foot and that it had been red and swollen for three days. (*Id.*) Plaintiff also requested a refill of his medications. (*Id.*) Dr. Worrell gave him a prescription for Lortab. (*Id.*) His blood pressure was 172/100. (*Id.*)

On January 10, 2009, Plaintiff saw Dr. Worrell about his blood pressure and his ankle pain. (*Id.* at 316.) His blood pressure was 130/90. Dr. Worrell prescribed Lortab for pain and recommended that he see his urologist. (*Id.*)

On January 19, 2009, Plaintiff saw Dr. Worrell about his ankle pain and requested a refill on his pain medication. (*Id.* at 315.) Plaintiff also discussed his desire to have prostate surgery.

(*Id.*)  His blood pressure was 134/90.  (*Id.*)  Dr. Worrell prescribed Lortab and referred Plaintiff to a pain management specialist.  (*Id.*)

On January 27, 2009, Plaintiff saw Dr. Worrell again.  (*Id.* at 314.)  Plaintiff reported that the pain management specialist recommended injections, but that he did not get any shots.  (*Id.*)  He also complained of blood in his urine and pain during sex.  (*Id.*)  Plaintiff reported that he had an appointment with a urologist on January 28, 2009. (*Id.*)  Plaintiff's blood pressure was 126/74. (*Id.*)  Dr. Worrell gave him a prescription for Lortab.  (*Id.*)

On January 27, 2009, Plaintiff saw Dr. Nabeel Syed regarding his prostate cancer.  (*Id.* at 371-374.)  Plaintiff reported occasional urgency hesitancy but no dysuria, frequency, hematuria or nocturia.  (*Id.* at 371.)  His blood pressure was 142/88.  (*Id.* at 372.)  The medical record noted that his hypertension was well-controlled.  (*Id.* at 371.)  The record also noted that his prostate cancer was severe or progressive.  (*Id.*)  Dr. Syed ordered a PSA test.  (*Id.* at 373.)  The report noted Plaintiff's PSA level as 9.  (*Id.* at 385.)

On February 18, 2009, Plaintiff saw Dr. Worrell.  (*Id.* at 313.)  He complained of pain in both legs due to gout and reported that his medication was not working.  (*Id.*)  He also reported that he needed to be checked and cleared for prostate surgery.  (*Id.*)  Plaintiff requested a refill of his hydrocodone medication.  (*Id.*)  His blood pressure was 160/100.  (*Id.*)  Dr. Worrell gave him a prescription for Lortab.  (*Id.*)

On February 18, 2009, Plaintiff saw Dr. Syed for a surgical consultation  (*Id.* at 367-374.)  Plaintiff reported partial erections and occasional urgency.  (*Id.* at 367.)  Plaintiff also complained of leg pain associated with gout.  (*Id.*)  Plaintiff's blood pressure was 140/100.  (*Id.* at 368.)  Dr. Syed ordered a repeat bone scan.  (*Id.* at 369.)

6

On March 2, 2009, Plaintiff had a bone scan at Dallas Regional Medical Center. (*Id*. at 381.) The report noted no evidence of prostate gland metastasis (*Id*.)

On March 7, 2009, Plaintiff saw Dr. Worrell again. (*Id*. at 312.) Plaintiff requested a refill of all his medications. (*Id*.) His blood pressure was 190/110. (*Id*.) Dr. Worrell gave him a prescription for Lortab. (*Id*.)

On March 11, 2009, Plaintiff saw Dr. Syed for a preoperative visit. (*Id*. at 362-366.) His blood pressure was 114/72. (*Id*. at 363.) Dr. Syed explained the prostatectomy and lymph node biopsy procedures. (*Id*. at 364.)

On March 14, 2009, Plaintiff saw Dr. Worrell. (*Id*. at 311.) His blood pressure was 136/80 and 144/80. (*Id*.)

On March 21, 2009, Plaintiff visited the Emergency Room at Doctors Hospital. (*Id*. at 271.) He was admitted on March 22, 2009 and discharged on March 24, 2009. (*Id*. at 269.) His complaint was seizure-like activity that left him confused and disoriented. (*Id*. at 278.) His blood pressure was recorded as 150/93 and 181/98 on March 22 and March 23, respectively. (*Id*. at 279, 285.) Dr. Ranjan Chandra examined him and concluded that the seizure episode was likely preceded by a transient ischemic attack or a cerebrovascular event. (*Id*. at 280.) His discharge plan included anti-seizure medication, and he was advised to stop smoking and follow a low sodium diet. (*Id*. at 269, 295.)

On March 25, 2009, Plaintiff saw Dr. Worrell. (*Id*. at 310.) Plaintiff reported that he had a seizure the previous Saturday, but that CT scans of his stomach and head and an MRI of his brain were "negative". (*Id*.) His blood pressure was 136/90 and 150/80. (*Id*.) He requested a refill of his Lortab. (*Id*.) The record noted that his last prescription was issued March 7, 2009. (*Id*.)

7

On April 3, 2009, Dr. Syed performed a radical retropubic prostatectomy and bilateral pelvic node dissection on Plaintiff. (*Id*. at 298-299, 302-303, 388-389.) The pathology report noted that the lymph node dissections were negative for tumor. (*Id*. at 387.) The record also noted that the patient demonstrated a relatively high tumor volume with involvement of nearly half of the right prostate and approximately a third of the left prostate. (*Id*.) It also stated that the tumor displayed extensive perineural invasion and focal extracapsular extension and was diffusely transected along the right lateral aspect of the gland. (*Id*.) The report also noted that the tumor represented a pathologic stage III (pT3a pNO pMx) lesion. (*Id*.)

On April 10, 2009, Plaintiff saw Dr. Syed for a postoperative follow up. (*Id*. at 360-361.) Dr. Syed noted that a foley catheter was still in place and draining good amounts of urine, and that the surgical wound was not ready for staple removal. (*Id*. at 360.) Plaintiff's blood pressure was 120/78. (*Id*.) Dr. Syed gave him a prescription for Vicodin. (*Id*.)

On April 13, 2009, Plaintiff saw Dr. Worrell (*Id*. at 309.) He complained of abdominal pain and pain in the area of his staples following prostate removal surgery. (*Id*.) His blood pressure was 126/78. (*Id*.) Dr. Worrell gave him a prescription for Lortab. (*Id*.)

On April 14, 2009, Plaintiff saw Dr. Syed for a postoperative visit. (*Id*. at 356-359.) Upon examination, his blood pressure was 126/78. (*Id*. at 357.) Plaintiff's staples were removed at this visit. (*Id*. at 356.)

On April 27, 2009, Plaintiff saw Dr. Syed. (*Id*. at 352-355.) Plaintiff reported occasional hematuria and a fever over the past few days. (*Id*. at 352.) His blood pressure was 126/74. (*Id*. at 353.) The foley catheter was removed. (*Id*. at 352.) Dr. Syed gave Plaintiff a prescription for Vicodin and referred him to Dr. Edward Gilbert for radiation treatment. (*Id*. at 354.)

On May 5, 2009, Plaintiff saw Dr. Worrell for medication management.  (*Id*. at 332.)  His blood pressure was 122/64.  (*Id*.)  Dr. Worrell gave him a prescription for Lortab.  (*Id*.)

On May 5, 2009, Plaintiff saw Dr. Syed for a postoperative follow up.  (*Id*. at 348-351.)  Plaintiff complained of suprapubic abdominal pain at that time.  (*Id*. at 348.)  Upon examination, his blood pressure was 138/84.  (*Id*. at 349.)  Dr. Syed ordered a PSA test and gave him a prescription for Vicodin.  (*Id*. at 350-351.)  The report noted Plaintiff's PSA level as less than .1.  (*Id*. at 383.)

On May 28, 2009, Plaintiff saw Dr. Roberta Herman for a physical residual functional capacity evaluation.  (*Id*. at 323-330.)  Dr. Herman noted that Plaintiff was a 52 year old male alleging disability due to prostate cancer, high blood pressure, chronic obstructive pulmonary disease, emphysema and seizures.  (*Id*. at 324.)  She found Plaintiff somewhat limited but concluded that the impact of his impairments did not wholly compromise his ability to function.  (*Id*.)  Dr. Herman found that Plaintiff's exertional limitations limited him to occasionally lifting and/or carrying 20 pounds, frequently lifting and/or carrying 10 pounds, standing and/or walking for a total of about 6 hours in an 8 hour workday, sitting for about 6 hours in an 8 hour workday with an unlimited capacity to push and/or pull.  (*Id*.)  His postural limitations included never climbing ladders, ropes and scaffolds, occasionally climbing ramps/stairs and balancing and frequently stooping, kneeling, crouching and crawling.  (*Id*. at 325.)  Dr. Herman concluded that Plaintiff's allegations were not fully supported by the medical evidence and other evidence of record.  (*Id*. at 328.)

On June 16, 2009, Plaintiff saw Kelli Whitehead, ARNP at Urology Associates.  (*Id*. at 343-347.)  At that time, he complained of erectile dysfunction, urinary incontinence and fecal

incontinence.  (*Id*. at 343.)  Plaintiff also complained of lower right suprapubic abdominal pain.  (*Id*.)  His blood pressure was 128/82.  (*Id*. at 344.)  NP Whitehead gave Plaintiff a prescription for Vicodin.  (*Id*.)  She referred Plaintiff to a Dr. Gilbert for radiation therapy and ordered a CT of Plaintiff's abdomen and pelvis.  (*Id*. at 346.)

On June 22, 2009, Plaintiff visited the Texas Clinic at Prestonwood.  (*Id*. at 377-378.)  He had a CT scan of his abdomen and pelvis with and without contrast.  (*Id*. at 377.)  The CT report noted a gallstone, generous fracture calcification of the abdominal aorta and pelvic vasculature with no evidence of abdominal aortic aneurysm.  (*Id*. at 377-78.)  The report also noted that the prostate was absent with multiple metallic clips in the prostate bed and both walls of the true pelvis, no soft tissue mass identified, diverticulosis of the descending colon without CT evidence of diverticulitis, and no CT evidence of metastatic disease.  (*Id*.)

On July 16, 2009 Plaintiff had another PSA test.  (*Id*. at 382.)  The report noted Plaintiff's PSA level as less than .1.  (*Id*.)

On July 23, 2009, Plaintiff saw Dr. Worrell for medication management.  (*Id*. at 331.)  At that time he complained of ankle pain.  (*Id*.)  His blood pressure was 116/76.  (*Id*.)  Dr. Worrell gave him a prescription for Lortab.  (*Id*.)

On July 24, 2009, Plaintiff saw Dr. Aamer Agha upon a referral from Dr. Syed due to abdominal pain.  (*Id*. at 333.)  His blood pressure was 125/75.  (*Id*. at 334.)  Dr. Agha recommended a colonoscopy due to Plaintiff's abdominal pain and history of colon polyps.  (*Id*. at 335.)

On July 27, 2009, Dr. Agha performed a colonscopy on Plaintiff.  (*Id*. at 336-337.)  The pathology report listed a finding of tubular adenoma, mild nonspecific chronic inflammation, slight lamina proprial fibrosis and a hyperplasic polyp.  (*Id*.)  It also showed negative findings for crypt

abscess, granulomata and neoplasia.  (*Id*.)  Dr. Agha recommended a repeat colonoscopy in three years.  (*Id*. at 336.)

Between July 28, 2009 and September 25, 2009, Dr. Edward Gilbert provided Plaintiff with radiation therapy.  (*Id*. at 375.)  Plaintiff tolerated the treatments well.  (*Id*.)

On August 27, 2009, Plaintiff saw Dr. Syed.  (*Id*. at 339-342.)  Plaintiff reported side effects following his prostatectomy, including urinary incontinence, diarrhea, and nocturia 2-3 times.  (*Id*. at 339.)  He complained mostly of urgency and stated he experienced occasional urgency incontinence.  (*Id*.)  He also complained of groin pain.  (*Id*.)  His blood pressure was 131/95.  (*Id*. at 340.)  Dr. Syed recommended that Plaintiff return to see him after he completed his radiation treatments.  (*Id*. at 342.)

On January 12, 2011, Plaintiff visited Tarrant County Hospital.  (*Id*. at 468-469.)  He complained of urinary incontinence and underwent an abdominal ultrasound.  (*Id*. at 468, 470.)  The report noted hepatic steatosis, but the study was otherwise unremarkable.  (*Id*.)  The treating physician recommended a cystoscopy.  (*Id*. at 469.)

On February 16, 2011, Plaintiff visited Tarrant County Hospital again.  (*Id*. at 463, 466.).  His treating physician performed a cystoscopy.  (*Id*. at 463.)  The report showed a completely normal urethra.  (*Id*.)  Plaintiff's doctor recommended placement of an artificial sphincter.  (*Id*.)

On March 10, 2011, Dr. Gonzalo Lievano performed an artificial sphincter placement on Plaintiff.  (*Id*. at 464.)  On that same date, a pathology report noted the removal of a foreign body described as a coiled fragment of silver metallic wire with a fragment of edematous adipose tissue adherent to it.  (*Id*. at 461.)

On March 23, 2011, Plaintiff visited Tarrant County Hospital for a follow up visit.  (*Id*. at

464.)  The medical record noted that Plaintiff was doing well and that his staples were to be removed.  (*Id*.)  The record further noted that Plaintiff was to return to the clinic in five weeks.  (*Id*.)

### 3.  Hearing Testimony

On October 14, 2009, Plaintiff and a vocational expert testified at a hearing before the ALJ.  (*Id*. at 29-54.)  Plaintiff was represented by an attorney.  (*Id*. at 29.)

### a.  Plaintiff's Testimony

Plaintiff testified that he was 52 years old and was claiming an onset date of September 15, 2008, because that is the last date he worked.[3]  (*Id*. at 31.)

Plaintiff's last job was with a railroad company.  (*Id*. at 31.)  He worked as an engineer and supervised a crew of eight to ten men for 8 years.  (*Id*. at 31-32.)  He spent approximately one hour a day supervising his crew and he worked in the locomotive the remainder of the day.  (*Id*. at 51-52.)  He did not do any paperwork, any performance reviews or any hiring.  (*Id*.  at 52.)  Before then, he worked as a ground man loading and unloading trains.  (*Id*. at 32.)  Plaintiff's prior work history included a job with a drilling company more than 15 years ago, and he worked through a union doing construction work prior to that.  (*Id*. at 33, 45-46.)

Plaintiff had hernia surgery in 2008.  (*Id*. at 33-34, 42.)  He returned to work after his hernia surgery but was still missing a lot of work.  (*Id*. at 42.)  He testified that he was fired from his job as a result.  (*Id*. at 33)

Plaintiff claims he is disabled due to prostate cancer.  (*Id*. at 33.)  His prostate cancer was diagnosed at the time of his hernia surgery in 2008.  (*Id*. at 33, 35.)  He had laboratory work done and his "Ph level" was too high; he was referred to a doctor and the doctor confirmed he had prostate

---

[3]  Plaintiff was 52 at the time he became disabled and 53 at the time of the hearing.  (*Id*. at 29-31.)

cancer.  (*Id*. at 34.)  He had no history of prostate trouble prior to that time.  (*Id*. at 33-34.)  He had surgery for the prostate cancer in April 2009.  (*Id*. at 35, 43.)  When he had prostate surgery, the surgeon had to cut into the mesh placed during the prior hernia surgery to try to remove all the cancerous tissue.  (*Id*. at 43.)  Plaintiff has symptoms related to the surgery, including urinary urgency, and he has experienced urinary and bowel incontinence ever since his prostate surgery. (*Id*. at 43-44, 48.)  He wears protective undergarments.  (*Id*. at 44.)  Plaintiff did not know whether the incontinence was related to his prostate surgery or to the interference with the mesh.  (*Id*. at 48.) He has not consulted with his hernia doctor since undergoing surgery for the prostate cancer and was waiting to finish his radiation treatments.  (*Id*. at 47-48.)

Plaintiff has not been hospitalized since his prostate surgery and that he has not had any additional surgeries.  (*Id*. at 37.)

Plaintiff started radiation therapy right after his surgery.  (*Id*. at 35.)  He had 39 days of radiation treatments and he completed the treatments on September 26, 2009.  (*Id*. at 35-36.)  He had a follow up appointment scheduled in two weeks and did not know whether he would require chemotherapy.  (*Id*. at 43, 46.)

Plaintiff gets up around 5:00.  (*Id*. at 40.)  He makes coffee, helps his wife get ready for work, and drives her there.  (*Id*.)  He helps around the house by loading the dishwasher.  (*Id*. at 39-40.)  He watches TV, listens to the radio and reads the newspaper and magazines.  (*Id*. at 40-41.)

Plaintiff goes shopping twice a week.  (*Id*. at 41.)  He and his wife do not go on outings to the mall or to the movies.  (*Id*.)  He does not attend church often or belong to any groups or clubs. (*Id*. at 39.)  He does not have any hobbies or fish or attend sporting events.  (*Id*. at 41.)  He does not visit friends or relatives.  (*Id*.)

Plaintiff experiences fatigue due to the surgery and the radiation treatments. (*Id.* at 44.) Weakness is another symptom. (*Id.* at 46.) He feels uncomfortable and embarrassed around people because of his incontinence, and he does not engage in any activities because he tires so easily. (*Id.* at 46-47.) He can walk for a while but has to stop after no more than an hour. (*Id.* at 46.) He does not have problems sitting. (*Id.*) He can drive for up to 45 minutes; beyond that he gets weak and tired. (*Id.*)

Plaintiff testified that he takes hydrocodone four times a day for pain. (*Id.* at 44.) He rated his pain without medication as a 9 and with medication as a 4. (*Id.* at 45.)

### b.    *VRE Testimony*

Lesia Beasley, a vocational expert (VE), also testified at the hearing. (*Id.* at 49-54.) She testified that Plaintiff's past relevant history included jobs as a construction worker (very heavy, skill level two, DOT 869.687-026), supervisor for train operations (light, skill level eight, 184.167-294), and as a crane operator moving supplies on and off the train (medium, skill level five, 921.663-038). (*Id.* at 49.) She testified that the skills from his job as a supervisor were transferable. (*Id.* at 49-50.) The ALJ asked the VE to opine whether a hypothetical person of Plaintiff's age, education, and work experience could perform Plaintiff's past relevant work with the following limitations: sit, stand, and /or walk for six hours in an eight hour workday; no limits in pushing and pulling; never climb ladders, ropes, scaffolds; occasionally climb ramps and stairs and balance. (*Id.* at 50.) The VE opined that the hypothetical person could perform Plaintiff's past relevant work as a supervisor. (*Id.*) The ALJ asked the VE to opine whether a hypothetical person of Plaintiff's age, education and work experience could perform Plaintiff's past relevant work with the additional limitation of sitting or standing at will, with all other limitations remaining the same. (*Id.*) The VE

14

again opined that the hypothetical person could perform Plaintiff's past relevant work as a supervisor.  (*Id*. at 51.)

Plaintiff's attorney asked the ALJ for permission to call the Plaintiff again to clarify his work duties in his prior position; after he did so, the ALJ again asked the VE whether Plaintiff could perform his past relevant work as a supervisor.  (*Id*. at 51, 53.)  The VE testified that Plaintiff could not perform his past work as he had described it, but that he could perform the duties as described in the DOT for a supervisor of train operations.  (*Id*. at 53.)

Plaintiff's attorney asked the VE to opine whether a hypothetical person of the same age, education, and past work experience as Plaintiff would be able to perform his past work with the same limitations described by the ALJ, but with a need for daily narcotic pain medication such that he would not be able to maintain production standards or work an eight hour day.  (*Id*. at 53-54.) The VE opined that such a person would not be able to maintain a standard eight hour work schedule.  (*Id*. at 54.)

**C.**     ***ALJ's Findings***

The ALJ denied Plaintiff's application for benefits by written opinion issued on April 30, 2010.  (*Id*. at 7-22.)  At step 1, the ALJ found that Plaintiff met the insured status requirements through December 31, 2013, and had not engaged in substantial gainful activity since September 15, 2008, his amended onset date.  (*Id*. at 12.)  At step 2, the ALJ found that Plaintiff's prostate cancer and essential hypertension qualified as a severe impairment.  (*Id*.)  At step 3, the ALJ found that Plaintiff did not have a severe impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id*.)  At step 4, the ALJ found that Plaintiff has the physical residual functional capacity to perform light work in

a sit, stand, and/or walk at will option type work environment.  (*Id*. at 13.)  Based on the testimony

of the vocational expert, the ALJ found that Plaintiff is capable of performing his past relevant work

as a supervisor of train operations.  (*Id*. at 18.)   He concluded that Plaintiff was not disabled at any

time through the date of the decision. (*Id*. at 19.)

## II.  ANALYSIS

**A.**   *Legal Standards*

### 1.      Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the

Commissioner's position is supported by substantial evidence and whether the Commissioner

applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236

(5th Cir. 1994); 42 U.S.C. § 405(g).  "Substantial evidence is that which is relevant and sufficient

for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla,

but it need not be a preponderance."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting

*Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).   In applying the substantial evidence

standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own

judgment, but rather, scrutinizes the record to determine whether substantial evidence is present.

*Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a

conspicuous absence of credible evidentiary choices or contrary medical findings to support the

Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program

is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759

F.2d 432, 435 n. 1 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the

determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.* at 436 and n.1.

## 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295. An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential 5-step analysis to determine whether a claimant is disabled:

1.      An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.      An individual who does not have a "severe impairment" will not be found to be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work he has done in the past, a finding

of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first 4 steps of the analysis, the burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first 4 steps that the claimant is disabled or is not disabled.  *Id.*  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step 5 to show that there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.**      ***Issues for Review***

Plaintiff raises the following issues for review:

1.      The Plaintiff contends that he has established by objective medical evidence a mental or physical disability in accordance with the Listing of Impairments, Appendix 1, Subpart P of Regulations No. 4;

2.      The Plaintiff contends that the Defendant did not properly consider the element of pain.  Such constitutes error.

3.      The ALJ's hypothetical questions violate the Fifth Circuit Rule (Gray v. Sec. of

18

HEW, 421 F.2d 638 (5th Cir. 1970).  The ALJ considered information in his decision which does not constitute substantial evidence and requires reversal.

**C.**     ***Issue One:  Meeting a Listed Impairment***

Plaintiff first contends that he established a disability in accordance with the listed impairments in Appendix 1, Subpart P of Regulations No. 4.  (Doc. 17 at 1, 9-10.)  He argues that the ALJ improperly concluded that he did not meet the criteria of any of the listings and that he failed to specifically state the medical evidence upon which he relied.  (*Id*. at 9-10; R. at 54.)

**1.     No Listing Identified by Plaintiff**

The listed impairments in the Social Security regulations "are descriptions of various physical and mental illnesses . . . most of which are categorized by the body system they affect." *Sullivan v. Zebley*, 493 U.S. 521, 529-30 (1990).  "Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results."  *Id*. at 530.  "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria."  *Id*. (emphasis in original).  The specified medical criteria are designed to be demanding and stringent because they lead to a presumption of disability making further inquiry unnecessary.  *Id*. at 532; *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994.)  The claimant bears the burden of proving that his impairments meet or equal the criteria found within the Listings.  *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990).  If a claimant fails to meet this burden, the ALJ's finding is supported by substantial evidence.  *Henson v. Barnhart*, 373 F. Supp.2d 674, 685 (E.D. Tex. 2005 (citing *Selders*, 914 F.2d at 620).

Here, Plaintiff does not identify the specific listing he contends his impairment satisfies. (Doc. 17 at 10.)  He merely states that the medical reports support a finding of disability "based on the above criteria", but he does not identify the applicable criteria nor does he point to evidence in

the record sufficient to establish that he meets the criteria for a specific listing.[4] (*Id.*) Accordingly, Plaintiff has failed to satisfy his step 3 burden and the ALJ's finding is supported by substantial evidence.[5] *See Garrett v. Astrue*, 4:11-CV-066-Y, 2011 WL 6938463, *8 (N.D. Tex. Oct. 18, 2011) (recommendation of Mag. J.) (finding that substantial evidence supported the ALJ's decision because the claimant failed to argue or provide evidence that he met specific sections of the Listings), *adopted by* 2012 WL 11124 (Jan. 3,2012); *Lloyd v. Astrue*, No. 10-0920, 2011 WL 7049451, *3 (W.D. La. Dec. 7, 2011) (recommendation of Mag. J.) (finding that substantial evidence supported the ALJ's decision because the claimant failed to identify a specific listing or prove that he met or equaled the criteria for a specific listing, *adopted by* 2012 WL 135677 (Jan. 17, 2012), *aff'd*, 2012 WL 3206552 (5th Cir. Aug. 8, 2012); *White v. Astrue*, 2009 WL 4823843 (M.D. La. Dec. 10, 2009) (Mag. J.) (finding that the claimant failed to meet his step 3 burden when he failed to identify a specific listing or offer evidence that his impairments met or equaled a listed impairment).

### 2.      ALJ's Error

Plaintiff argues that the ALJ failed to specifically identify the medical evidence he relied upon in making his step 3 determination, so it is therefore not supported by substantial evidence.

---

[4] Plaintiff does not argue that the ALJ failed to identify every listing that could apply to claimant. *See Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007).

[5] Plaintiff's attorney argued at the conclusion of the administrative hearing that Plaintiff met Listing 13.24 for prostate gland–carcinoma. (R. at 54.) Even assuming for purposes of this motion that this is the listing that Plaintiff is claiming he met, he has failed to show that he meets the criteria for this listing. He must show that his cancer is "[p]rogressive or recurrent despite initial hormonal intervention" or "[w] visceral metastases (metastases to internal organs)." 20 C.F.R. pt. 404, subpt. P, app. 1, § 13.24. Plaintiff pointed to no evidence showing that his cancer was progressive or recurrent despite initial hormonal intervention, and the medical record is clear that Plaintiff's cancer had not metastacized. (R. at 206, 377-378, 381.) The ALJ's step three finding is supported by substantial evidence. *See Molaison v. Astrue*, 1:09-CV-158-C, 2011 WL 1085272, *3 (N.D. Tex. Mar. 2, 2011) (recommendation of Mag. J) (citing *Selders v. Sullivan*, 914 F.2d 614, 620 (5th Cir. 1990)) ("If a claimant fails to provide and identify medical signs and laboratory findings that support all criteria of a Listing, the court must conclude that substantial evidence supports the ALJ's finding that the required impairments for any Listing are not present."), *adopted by* 2011 WL 1085608 (Mar. 23, 2011).

(Doc. 17 at 10.)  *See Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (the ALJ commits error when he fails to discuss the evidence offered in support of a disability claim or fails to explain the basis for an unfavorable finding at step three).  Because the ALJ did not discuss the basis for his step 3 determination, he committed error.

The analysis does not end there, however, and requires a further determination of whether the error was harmless.  *See id.* (citing *Morris v. Bowen*, 864 F.2d 333, 334 (5th Cir. 1998)).  An error is harmless as long as it does not affect the substantial rights of a party.  *See id.* ("Procedural perfection in administrative proceedings is not required as long as the substantial rights of a party have not been affected.") (quoting *Mays v. Bowen*, 837 F.2d 1362, 1362 (5th Cir. 1988)).  Here, the ALJ's error in failing to provide reasons for his step three finding was harmless because Plaintiff has not shown that he met his burden to establish that he met the specified medical criteria for an identified listing.  Because the error was harmless, remand is not required on this basis.

**D.**     *Issue Two: Credibility*

Plaintiff contends that the ALJ failed to properly consider Plaintiff's testimony about his pain and his other subjective complaints.  (Doc. 17 at 11.)  He argues that the ALJ failed to determine whether his pain was linked to a medically determinable impairment and that the evidence of his pain and discomfort is sufficient to prove his disability (*Id.* at 12.)

In all cases in which pain or other nonexertional symptoms such as fatigue, weakness or nervousness are alleged, the administrative decision must contain a thorough discussion and analysis of the objective evidence, including the individual's complaints of pain or other symptoms and the adjudicator's own observations.  SSR 95-5p, 1995 WL 670415, at *2 (S.S.A. Oct. 31, 1995).  An individual's statements with respect to pain and other symptoms alone are not conclusive evidence

of a disability and must be supported by objective medical evidence of a medical impairment that could reasonably be expected to produce the pain or other symptoms alleged.   42 U.S.C. § 423(d)(5)(a).   The mere existence of pain is not an automatic ground for disability, and subjective evidence of pain does not take precedence over conflicting medical evidence.   *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989) (citations omitted).   In the Fifth Circuit, if "pain is linked to an objectively verifiable condition . . . it is not necessary that the pain which allegedly disables the claimant be proved objectively, but it must still be proved by the claimant."   *See Anderson v. Sullivan*, 887 F.2d 630, 633 (5th Cir. 1989).

The ALJ is in the best position to assess a claimant's credibility about his symptoms since the ALJ "enjoys the benefit of perceiving first-hand the claimant at the hearing."   *Falco v. Shalala*, 27 F.3d 164 n. 18 (5th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996).   First, the ALJ must consider whether the claimant has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms.   *Id*.   Once such an impairment is shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the individual's ability to do basic work activities.   *Id*.   If the claimant's statements concerning the intensity, persistence, or limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a credibility finding regarding the claimant's statements.   *Id*.; *Falco*, 27 F.3d at 164 (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1985)).   Credibility determinations by an ALJ are entitled to deference.   *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991).

The ALJ's credibility determination must be based on a consideration of the entire record, including medical signs and laboratory findings, and statements by the claimant and his treating or

examining sources concerning the alleged symptoms and their effect.  SSR 96-7p, 1996 WL 384186, at *2.  The ALJ must also consider a non-exclusive list of seven relevant factors in assessing the credibility of a claimant's statements: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, for relief of pain or other symptoms; (6) measures other than treatment (e.g., lying flat on his or her back); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  *Id.* at *3**.**

Here, the ALJ acknowledged a link between Plaintiff's alleged symptoms and his medically determinable impairments, but concluded from objective and other medical evidence that Plaintiff was not telling the truth.  He specifically found that Plaintiff's "medically determinable impairments could produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are neither entirely credible, nor consistent with" the evidence of his residual functional capacity as borne out by the medical record and other evidence.  (R. at 16.)  The ALJ found that Plaintiff's impairments could be expected to produce some of his pain but not to the degree he claimed.  (*Id.* at 12-16.)  His decision reflects that he reviewed the evidence before applying several of the credibility factors listed in SSR 96-7p to Plaintiff's case.  (*Id.*)  He considered Plaintiff's course of treatment, hearing testimony and the medical evidence before determining that Plaintiff's subjective complaints were not completely credible.  (*Id.* at 15-17.)  The ALJ gave "special attention" to Plaintiff's allegations of pain.  (*Id.* at 16.)  He considered Plaintiff's daily activities–his ability to sit, walk, drive, help with household

chores and shop. (*Id.* at 17; R. at 39-46.)  He reviewed treatment records from Drs. Paul Worrell and

Aamer Agha documenting Plaintiff's complaints of foot pain, leg pain and abdominal and groin pain

between January 2009 and April 2009.  (*Id.* at 14,309, 312-14, 333-335, 339-342.)  Dr. Worrell

treated Plaintiff's complaints of pain with only medication and that he recommended that Plaintiff

engage in walking and light exercise more often.  (*Id.* at 309, 314-314, 346, 348, 352, 356.)  He

relied on the consultative and residual functional capacity examinations by experts.  (*Id.* at 18.)  He

noted the absence of objective factors indicating the existence of severe pain, such as "severe

muscles [sic] weakness, atrophies, deformities, swelling, tenderness, marked spasm, joint stiffness,

wasting of muscle, range of motion limitation, weight loss, and sensory-motor deficits." (*Id.* at 16.)

The absence of such findings justifies the conclusions of the ALJ.  *See Adams v. Bowen*, 833 F.2d

509, 512 (5th Cir. 1987).

    The ALJ's discussion shows that he relied primarily on the medical evidence of record to

find Plaintiff not credible.  Although not in a formalistic fashion, he also considered the factors for

determining credibility, and relied on substantial evidence to support his determination.  Remand

is not required on this issue.

**E.**     ***Issue Three:  Improper Hypothetical Testimony From the Vocational Expert***

    Plaintiff contends that in evaluating Plaintiff's residual functional capacity, the ALJ relied

on flawed VE testimony in response to an improper hypothetical question that did not include all

of the limitations caused by his pain, prostate cancer, back problems and other problems.  (Doc. 17

at 15-20.)

    To  establish that work exists for a claimant at steps four and five of the sequential evaluation

process, the ALJ relies on the medical-vocational guidelines or the testimony of a VE in response

to a hypothetical question. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).  A hypothetical question posed by an ALJ to a VE must reasonably incorporate all the claimant's disabilities recognized by the ALJ and the claimant must be afforded a fair opportunity to correct any deficiencies in the hypothetical question. *Id*. at 436.  A claimant's failure to point out deficiencies in a hypothetical question does not "automatically salvage that hypothetical as a proper basis for a determination of non-disability." *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001).  If the ALJ relies on testimony elicited by a defective hypothetical question in making a disability determination, the Commissioner does not carry his burden of proof to show that a claimant could perform available work despite an impairment. *Id*. at 708.

Here, the ALJ presented a hypothetical question to the VE asking whether a hypothetical person of Plaintiff's age, education, and work experience could perform Plaintiff's past relevant work if he could sit, stand, and /or walk for six hours in an eight hour workday. (R. at 50.)  The ALJ also included postural limitations for never climbing ladders, ropes and scaffolds and only occasionally climbing ramps and stairs and balancing. (*Id*.)  The VE opined that the hypothetical person could perform Plaintiff's past relevant work as a supervisor. (*Id*.)  The ALJ also presented a hypothetical question to the VE asking whether a hypothetical person of Plaintiff's age, education and work experience could perform Plaintiff's past relevant work if he could sit or stand at will, with all other limitations remaining the same. (*Id*.)  The VE again opined that the hypothetical person could perform Plaintiff's past relevant work as a supervisor. (*Id*. at 51.)  After the Plaintiff clarified the duties of his prior job as those of a working supervisor, the ALJ presented a hypothetical question to the VE asking whether a hypothetical person of Plaintiff's age, education and work experience could perform Plaintiff's past relevant work as a working supervisor if he could sit or

stand at will, with all other limitations remaining the same. (*Id.* at 53.) The VE testified that the hypothetical person could not perform Plaintiff's past work as he had described it. (*Id.*) The ALJ then presented a hypothetical question to the VE asking whether a person of Plaintiff's age, education and work experience could perform Plaintiff's past relevant work as a described in the DOT for a lead man (supervisor) of train operations if he could sit or stand at will, with all other limitations remaining the same. (*Id.*) The VE testified that the hypothetical person could do so. (*Id.*)

These hypothetical questions properly incorporated all of Plaintiff's limitations supported by the record and recognized by the ALJ. *See Masterson v. Barnhart*, 309 F.3d 267, 273 (5th Cir. 2002) (upholding ALJ's hypothetical question when it scrupulously incorporated all of the claimant's disabilities supported by evidence and recognized by the ALJ). Substantial evidence therefore supports the ALJ's step 4 finding that Plaintiff could perform his past relevant work as a supervisor of train operations as described in the DOT. The ALJ also properly rejected the VE's testimony that an individual with the additional limitations listed by Plaintiff's counsel would not be able to perform any work activity. An ALJ is not bound by VE testimony that is based upon evidentiary assumptions that he ultimately rejects. *See Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir. 1985). Accordingly, no error occurred and remand is not required on this issue.

### III. RECOMMENDATION

Plaintiff's motion should be **DENIED,** Defendant's motion should be **GRANTED**, and the final decision of the Commissioner should be **AFFIRMED**.

**SO RECOMMENDED**, **on this 6th day of September, 2012.**


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE


## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE